STATE OF MAINE
HANCOCK, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-01-48
JLH - HAN- 2/10/2004

Brenda Beal et al.,
    Plaintiffs

v.

Decision and Judgment

DONALD L. GARRECHT
LAW LIBRARY

MAR 8 2004

Coastal Auto Parts, Inc.,
    Defendant

Hearing in this matter was held on October 27 and 28, 2003. On those hearing dates, plaintiffs Brenda Beal and Stephen Beal were present with counsel. Their son, Christopher Beal, on whose behalf Stephen[1] has asserted a claim, was not present because he was in execution of a disposition following a juvenile proceeding. His testimony was presented by transcript. The defendant appeared through counsel. In addition to the evidence developed in the courtroom, the parties submitted a considerable amount of documentary evidence, including testimony transcripts and records, that the court has considered.

This case arises out of a motor vehicle collision that occurred on July 18, 1997, in Hancock. Brenda Beal was driving the family vehicle heading northbound on route 1. Her sister was seated in the front passenger seat, Christopher was in the rear passenger-side seat, and another son was seated behind her. A van traveling ahead of her in the same direction was waiting for traffic to clear in order to make a left turn. Brenda slowed or stopped her vehicle. The Beal vehicle was then struck from behind by a pick-up truck owned by the defendant and operated by an agent of the defendant. The defendant has admitted fault for the collision. The resulting impact caused considerable damage to the

---

[1] Throughout this opinion, the court sometimes will refer to members of the Beal family by their first names. This is done not as a sign of disrespect but for ease of reference.

1

rear of the Beal vehicle, and it pushed the vehicle into the rear of the van, causing a second impact with lesser damage. *See* plaintiffs' exhibits 3-6, 7, 9 (photographs). Brenda has brought a claim for damages she sustained in the accident, including emotional distress under a bystander theory based on the injuries caused to Christopher. *See Curtis v. Porter*, 2001 ME 158, ¶ 19, 784 A.2d 18, 25. Brenda's husband, Stephen, has brought a claim for loss of her consortium. Finally, in the most significant of the claims alleged in this case, Christopher seeks recovery for the psychological effects of a mild closed head injury he alleges he sustained in the collision. This latter claim was the focus of the trial, and the court addresses it first.

### Claims of Christopher Beal

The central aspect of Christopher's personal injury claim is that he sustained a mild closed head injury in the collision and that this injury affected the executive function of his brain. A person's executive function is the ability to plan, organize and solve problems. It also bears on a person's behavioral and emotional controls. *See* plaintiffs' exhibit 22 (Grueneich transcript) at p. 14. Christopher alleges that because the part of his brain controlling executive function (the frontal lobes, *see id.* at p. 24) was affected by the accident, he has an impairment of his abilities to control anger, to organize and plan and to pay attention, and he is more irritable. *See id.* at p. 56. Among other things, the defendant challenges Christopher's contention that the July 1997 collision was the legal cause of any such deficits.

In his closing argument, plaintiffs' counsel stated that the opinion evidence on which Christopher relies is that of Dr. Royal Grueneich (a neuropsychologist), Dr. Anthony Podraza (also a neuropsychologist), and Dr. Jeffrey Barkin (a psychiatrist). Reports and records associated with the work of all three experts are included in the evidence. Additionally, transcripts of testimony of the two neuropsychologists are part of the record. The court finds that the transcribed trial testimony of Dr. Grueneich is the probative on Christopher's causation argument. The court has considered the evidence flowing from the work that Drs. Barkin and Podraza have performed in this case. However, Dr. Barkin's opinion is of lesser probative force here because the court has only his report. The parties have chosen not to present his analysis in the form of a testimonial examination, where that opinion could be developed and tested. With as

complex a psychiatric and psychological issue as is raised here, that detracts from the weight of his opinion.

Then, Dr. Podraza's testimony is not weighted on the question of causation. He testified that he was told that Christopher sustained a head injury in the collision and then was asked to evaluate the effects of that injury. *See* defendant's exhibit 2 (Podraza transcript) at p. 14. This is his role in the great majority (99%) of cases in which he becomes involved. *Id.* at pp. 7, 8. Indeed, it appears that when the question of causation is presented to him, he determines whether his findings regarding a person's condition are merely consistent with someone who has a brain injury. *Id.* at p. 7. He reached that conclusion regarding Christopher. *Id.* at p. 22. Thus, the nature of the analysis sought from Dr. Podraza is limited and limiting.

In contrast, Dr. Grueneich was examined closely on the causation question and provided extensive testimony on that specific issue. Thus, the court considers him to be the primary source (although not the exclusive source) of evidence on Christopher's allegation that the July 1997 collision caused a mild closed head injury that affected some brain functions. For these reasons, the court finds that Dr. Grueneich's testimony most fully develops Christopher's claim of causation, and the court relies on that evidence most heavily in examining that part of Christopher's claim. Nonetheless, it is important to point out that the evidence of Dr. Podraza's opinion and Dr. Barkin's opinion suffer from the same foundational flaw as Dr. Grueneich's. Thus, the former are not sufficient to compensate for the problems discussed below.

As is noted above, Dr. Grueneich concluded that Christopher sustained a mild closed head injury in the accident at issue here and that this injury has had effects on several aspects of Christopher's behavior. In his transcribed testimony, Dr. Grueneich enumerated the factors that led him to this conclusion. Those factors include the medical evidence that supported a physiological diagnosis of a head injury; a history of prior head trauma that made Christopher more vulnerable to subsequent head injuries (such as the one allegedly caused in the July 1997 collision); changes in Christopher's behavior coinciding with the July 1997 accident; and the nature of those behavioral changes. *See* plaintiffs' exhibit 22 at pp. 86-87. Dr. Grueneich went on to say that his opinion is based on the combination of these factors. *Id.* at p. 87. Despite this latter disclaimer, however,

3

it is clear from Dr. Grueneich's testimony that an essential ingredient to his diagnostic opinion is the conclusion that, from a medical perspective, Christopher in fact suffered a physiological head injury in the accident. This observation is logical, because the premise of Dr. Grueneich's opinion (and the opinions of the other experts on this issue) is that Christopher sustained a head injury and that this injury had certain effects on him. Additionally, however, Dr. Grueneich's own testimony made this predicate clear. *See, e.g., id.* at p. 95 (without the medical symptoms of a head injury, the reports of changes in Christopher's behavior would not have been sufficient to support the conclusion that those changes were caused by the accident). Therefore, because Christopher's causation argument requires proof that he sustained a head injury in the accident, the court must first examine the evidence on this point.

"Head injury" is a medical term of art. From a formal medical standpoint, a head injury can occur when the patient experiences "some alteration in mental status or state of consciousness." *See* plaintiffs' exhibit 22 at p. 28. A loss of consciousness satisfies this diagnostic criterion. Alternatively, disorientation or confusion, combined with post-traumatic amnesia, constitutes an alteration of the patient's mental status necessary to support the diagnosis of a head injury. *Id.* at pp. 28-29. Here, Dr. Grueneich's conclusion that Christopher sustained a head injury is premised expressly on the former, that is, that Christopher lost consciousness subsequent to the collision. *See, e.g., id.* at pp. 86, 88, 94, 95-6. In accepting this premise, Dr. Grueneich relied on the description of Christopher's condition provided by Brenda, and he relied on reports of medical treatment provided to Christopher following the accident. The court finds that, for separate reasons, neither of these sources of information reliably establishes that Christopher lost consciousness.

Brenda told Dr. Grueneich that Christopher had been unconscious for between forty and forty-five minutes. *See* plaintiffs' exhibit 22 at pp. 11, 87. The court cannot place weight on Brenda's assessment of Christopher's condition following the accident. The strongest indication of the weakness in her recollection is found in her report that responders used the Jaws of Life to remove Christopher from the Beal vehicle. Not only did she advise Dr. Podraza of this, *see* defendant's exhibit 1A at p. 134 (Podraza report), but also she testified to this at trial. However, at trial, she then equivocated on this point.

4

More probatively, Richard Doughy, the paramedic who was responsible for attending to Christopher until he arrived at the hospital, explained that if the Jaws of Life had been used at the scene, its use would have been noted on the ambulance run sheet. It was not so noted, and the court concludes from this that this equipment in fact was not used. Although the use (or non-use) of the Jaws of Life does not bear directly on the question of whether Christopher lost consciousness, it is highly probative evidence that bears on the quality of Brenda's observations from that time.

It is also significant that Brenda provided varying reports regarding the length of time she says that Christopher was unconscious. In addition to the history she provided to Dr. Grueneich noted above, she told a physician's assistant, Alfred Wakeman, six days after the accident that Christopher had been unconscious for one hour, *see* defendant's exhibit 1C at p. 38, and she told Dr. Podraza that the duration may have been as short as thirty minutes, *see id.* at p. 134.[2] These variations are material because they relate to such an important point.

Finally, Brenda's report that Christopher was unconscious must be evaluated in light of other information about his condition. The most reliable information comes from Doughty, the paramedic. Doughty has a high level of qualification and has served as a first responder for thirty years. Although he was not present at the time of the collision, the court infers from the evidence that he was on the scene very promptly. The ambulance on which Doughy rode happened to be in the area of the collision when it was dispatched to the scene, and Doughty arrived within three minutes of that call. Because of the magnitude of the collision and the fact that it occurred on a well-traveled road, the court is willing to conclude that it was reported very promptly. All of this indicates that Doughty was at Christopher's side very soon after the accident.

Doughty performed an immediate assessment of Christopher's condition. This was done five minutes after Doughty received the dispatch and two minutes after he

---

[2] The medical report of treatment provided to Christopher at the hospital immediately following the accident includes a reference to loss of consciousness for "several minutes." *See* defendant's exhibit 1C at p. 83. The source of this information, however, is not made clear in the record. That fact, combined with the absence of any information regarding both the qualifications of the observer and that person's opportunities to make those observations, does not render this reference as something sufficient to establish that Christopher in fact was unconscious.

arrived. For purposes of the issue at hand, the important aspect of Doughty's evaluation is that Christopher was not unconscious. Christopher showed a decreased level of consciousness, and the level of his responsiveness was diminished. This condition, however, is distinct medically from a loss of consciousness, which, as Doughty explained, is a condition where the injured person lays still without movement or sound. Christopher, on the other hand, responded to stimulation, and he was able to make sounds (although not in the form of comprehensible words). Within ten minutes of that initial assessment, Christopher's condition had improved measurably.

Doughty was advised that, according to a bystander, Christopher had lost consciousness. Just as the hospital record reference to a loss of consciousness lacks probative force, *see* note 2 *supra*, the court does not rely on this notation: the identity of the observer is unknown, and the qualifications of the observer to make an important – and perhaps subtle – medical judgment is also not apparent.

Thus, the evidence relating to Christopher's condition at the scene is not sufficient to demonstrate persuasively that he had lost consciousness.

Christopher's condition at the hospital also bears on this issue. Christopher arrived there by ambulance at 1 p.m., fifteen minutes after the ambulance had reached the scene itself. When he was first seen at the hospital, he appeared lethargic but was fully oriented. *See* defendant's exhibit 1A at pp. 84 (triage record), 88 (emergency department nursing note). He was not in pain, *see id.* at p. 84, and his neurological status was unremarkable, *see id.* at p. 88. Later at the hospital, he underwent a CT scan. The report associated with that process notes that he napped during that procedure. *See id.* at p. 87. However, the court is willing to infer that the trained medical staff at the hospital was capable of distinguishing between a nap and an episode that would be have medical significance, particularly when the purpose of the CT scan was to aid in determining if Christopher had sustained a head injury that could be detected through that diagnostic tool. (None was detected. *See id.* at p. 90.) Christopher was treated at the hospital and then released that day.

To the extent that it has relevance to the question of a loss of consciousness at the time of the accident, Christopher's follow-up examination with a physician's assistant, who worked at the clinic where Christopher was regularly a patient, also does not support

6

his allegations here. Christopher had that office visit on July 23, less than one week subsequent to the accident. Christopher reported that he sometimes had headaches following the accident. However, the PA, Alfred Wakeman, concluded that Christopher was "generally healthy" and, more specifically, showed no neurological problems.[3] Wakeman advised Christopher to contact the clinic if the headaches continued or if he (Christopher) developed any other problems. As it turned out, Christopher's next visit to the clinic was six months later for unrelated injuries he sustained in an incident with an ATV.

From an examination and consideration of this evidence, Christopher has not established that he lost consciousness as a result of the collision. This failure of proof undermines an essential element of the foundation on which the opinions of Drs. Grueneich, Podraza and Barkin rest.

The court must also consider, however, Dr. Grueneich's testimony that a head injury can be diagnosed based on disorientation combined with post-traumatic amnesia. Christopher was disoriented, as is shown by, among other things, Doughty's findings: his initial assessment of Christopher, based on the standardized Glasgow Coma Score, shows some level of disorientation. Also, Christopher did suffer post-traumatic amnesia: even to the present, he has no memory of the accident or the times shortly prior and subsequent to it.

Despite this evidence, however, the court declines to adjust Dr. Grueneich's analysis and plug in an ingredient that he himself did not use. The record supports meaningful debate about the nature and extent of changes in Christopher's behavior subsequent to the accident.[4] Both for its own sake and because of the ambiguous nature

---

[3] Christopher discounts the results of Wakeman's neurological assessment on the basis of Wakeman's testimony that he (Wakeman) would defer to the opinions of a neuropsychologist. *See* defendant's exhibit 1A (Wakeman transcript) at p. 44. Christopher also argues that the July 18 CT scan that did not reveal any new head injuries does not undermine his allegation to the contrary. This argument accurately reflects the testimony of his expert. *See* plaintiffs' exhibit 22 at p. 19. However, at some point, the accumulation of such negative findings begins to attain some significance.

[4] For example, some of the school records regarding those aspects of Christopher's behavior that he alleges were impaired following the accident, when viewed as a whole, do not reveal significant changes. *See, e.g.,* defendant's exhibit 1B at pp. 291, 301, 307.

of the evidence concerning those changes, the court will not speculate about whether a different medical analysis underlying the diagnosis of a head injury, compared with the diagnosis that Christopher's experts made on the basis of reports that have not been substantiated persuasively on this record, would lead to the same conclusion that those experts in fact reached here. As Doughty and Dr. Grueneich both pointed out, a loss of consciousness is a different neurological event that an episode of disorientation. The two therefore are not fungible, and the court concludes that it would be speculative to conclude that they have the same psychoneurological significance in the circumstances of this case.

For these reasons, even when Dr. Grueneich's testimony is construed expansively to allow a diagnostic basis greater than the one he actually used, the evidence is insufficient to allow Christopher to carry his burden of demonstrating that he sustained a head injury of the type necessary to support the conclusions reached by his expert witnesses.

Because of this, the court is left with evidence that Christopher sustained injuries that were much more limited and transitory than those that he urges here. Although the copy of the hospital record is not of good quality, it appears that the final diagnosis was multiple contusions. *See* defendant's exhibit 1A at p. 83. Six days later, he was found to be "generally healthy" although complaining of occasional headaches, a pain on the

---

Dr. Grueneich's formed his opinion based in part on only one school record, although subsequently he reviewed additional reports that he felt supported that opinion. However, the trial testimony of one of Christopher's teachers does not reveal the kinds of problems that are indicative of the problems identified by him. Further, the experts testified that if Christopher sustained neuropsychologically significant injuries in the accident, they would expect to see changes in his behavior promptly after that accident. *See, e.g.,* plaintiffs' exhibit 22 at p. 22; also trial testimony of Dr. David Marks. However, when pressed on the issue, Dr. Grueneich stated that the changes in Christopher's behavior on which he relied occurred only sometime during the eleven months between the accident and Christopher's evaluation by Dr. Podraza. *See* plaintiffs' exhibit 22 at p. 71. The parents' trial testimony suggested a gradual, rather than prompt, evolution of the symptoms that Christopher argues are a manifestation of his relevant deficits. Further, as is noted in this order, Christopher did not seek further evaluation or treatment from his family doctor, despite being told to do so if problems continued or arose.

8

outside portion of his ear[5] and discomfort in an elbow. Because Christopher and his mother were instructed to contact that medical office if problems continued, and because they did not do so, the court can only infer that those problems resolved promptly. Thus, the court concludes that Christopher has proven a modest level of past physical pain and suffering arising from the accident. There is no substantial evidence of emotional trauma from the fact of the accident, perhaps because Christopher has no memory of the event. He is entitled to recover medical expenses for the ambulance service ($388), for the treatment at the hospital on the date of the accident ($1,561.75), and for the July 23 office visit ($40), which total nearly $2,000. *See* plaintiffs' exhibit 16.

Based on the limited damages that Christopher has proven are the defendant's responsibility, the court awards compensatory damages of $7,500.

### Claims of Brenda Beal

Brenda seeks recovery for her own injuries, including the effects of her observations of Christopher's involvement in the collision.

Because of the multiple impacts, Brenda was thrown back and forth several times between her seat back and the area of the steering wheel, from which the airbag deployed. She promptly turned her attention to Christopher but felt pain in her head, upper and lower back, and chest. She was transported to the hospital on a backboard. When she arrived, she continued to be in pain but was not in acute distress. *See* plaintiff's exhibit 10. She was alert and fully oriented. A CT scan of her head and x-rays of her back and chest were normal.[6] After spending several hours at the hospital, she was discharged in stable condition with detailed instructions to remain alert for particular symptoms, mostly involving her back. *Id.* As a result of the effects of her injuries, Brenda was unable to work for one week, thereby losing income of $260.

The bruises she sustained in the accident healed promptly. However, her neck and back pain persisted. On August 11, she sought follow-up treatment from her family

---

[5] The physician's assistant who performed that examination found that the ear injury, a laceration, was to the outer portion of that ear. This then is not indicative of an injury to the inner portion of the head.

[6] Brenda was reportedly light-headed at the scene. *See* plaintiffs' exhibit 10. Although there is a notation in the CT report that she lost consciousness, *id.*, she advised Wakeman that she did not lose consciousness. *Id.* Thus, this aspect of her condition is uncertain.

medical provider. She presented complaints of pain in her neck and lower back, particularly when she lifted objects or when she sat or stood for extended periods of time. She was instructed to perform stretching exercises, apply heat and take ibuprofen when needed. At the end of October, she reported continuing pain and stiffness in her back. Brenda was then referred to physical therapy. The evidence includes the report memorializing her initial assessment at PT. (Brenda testified that the other records are missing.) This one report makes reference to pain and limited range of motion in her lower back, and ongoing headaches. Brenda attended five sessions between mid-November and mid-December, which provided her with some relief.

Brenda now still has some occasional pain and stiffness, particularly in her neck. This inhibits her ability to lift heavy items. She takes over-the-counter medications and performs exercises at home. Nonetheless, she has not missed any work since the time immediately following the accident; she does not appear to have sought or received medical treatment for her injuries since the course of her physical therapy ended in late 1997; and there is no evidence of permanency. Her medical expenses amount to $2,800.

Brenda has persistent thoughts and images about the collision. They focus largely on her memories of Christopher's situation, although, as is discussed above, some of her memories do not accurately reflect the circumstances of the crash. Brenda testified that she is unable to afford counseling. However, the records relating to treatment provided to her following the accident do not make reference to its emotional impact on her, and the court infers from this that she did not raise this issue with her treaters. Nonetheless, her apprehensions at the time of the accident were fully reasonable, and the lingering effects are understandable. For quite awhile, she was unable to escape her feeling that she was responsible for the accident, although the evidence presented in this case establishes clearly that she was not at fault. Brenda still is anxious when she drives, and she drives less frequently and for shorter distances than prior to the accident. This has shifted some of the driving responsibilities over to her husband.

Based on this evidence, the court awards Brenda Beal compensatory damages of $25,000.

### Claim of Stephen Beal

Stephen Beal seeks recovery for the loss of Brenda's consortium. As is noted above, Brenda sometimes is unable to engage in physical activities that she performed prior to the accident. Additionally, Stephen drives more than he used to because of Brenda's fears. The emotional effects of the accident experienced by Brenda can only have had some impact on the marriage.

A significant part of Stephen's consortium claim is based on the amount of time that Brenda claims to spend dealing with Christopher's circumstances and arranging for rehabilitation and treatment for him. However, because the defendant is not responsible for the deficits that underlie those efforts and concerns, the court cannot compensate Stephen for any such interruption in the marriage caused by Brenda's work in those areas.

The court awards Stephen Beal compensatory damages of $7,500.

For the foregoing reasons, judgment is entered for each plaintiff against the defendant. Plaintiff Brenda Beal is awarded damages of $25,000. Stephen Beal as parent and next friend of Christopher Beal is awarded damages of $7,500. Stephen Beal in his individual capacity is awarded damages of $7,500. Pursuant to 14 M.R.S.A. § 1602-B, the plaintiffs are awarded pre-judgment interest at the annual rate of 8% and post-judgment interest at the annual rate of 7.41%. The plaintiffs are awarded their costs of court.

Dated: February 5, 2004

_____
Justice, Maine Superior Court

**FILED &
ENTERED**

FEB 1 0 2004

**SUPERIOR COURT
HANCOCK COUNTY**

11